IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

DAWN M. KICKLIGHTER,          *
                              *
        Plaintiff,            *
                              *
        v.                    *          CV 214-088
                              *
MCINTOSH COUNTY BOARD OF      *
COMMISSIONERS and SAUNDRA     *
"BOOTIE" GOODRICH, in her     *
individual and official       *
capacities as Clerk of Court  *
for McIntosh County,          *
                              *
        Defendants.           *

---

**O R D E R**

---

Presently before the Court is Defendants' motion for summary judgment (Doc. 19). For the reasons below, Defendants' motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. BACKGROUND

The present dispute arises out of Plaintiff's employment as a deputy clerk for Defendant Saundra "Bootie" Goodrich, who serves as the McIntosh County Clerk of Superior Court, the McIntosh County Clerk of State Court, and the McIntosh County Clerk of Juvenile Court. (Compl., Doc. 1.) Hired as a deputy clerk in 2004, Plaintiff was promoted to chief deputy clerk in 2005 and served in that capacity until being terminated in March 2014. (Id.) Following her termination, Plaintiff filed this suit alleging several counts of wrongdoing by Goodrich, in her

individual and official capacities, and the McIntosh County Board of Commissioners ("McIntosh County Board"). (Id.) First, Plaintiff alleges that Defendants violated her First Amendment right of association by terminating her employment because of her marriage to Robert Kicklighter. (Id.) Second, Plaintiff alleges that Defendants failed to provide her with overtime compensation in violation of the Fair Labor Standards Act ("FLSA"). Third, submitting that she suffers from hypothyroidism, asthma, and sleep apnea, Plaintiff alleges that Defendants terminated her on the basis of a perceived or actual disability in violation of the Americans with Disabilities Act ("ADA"). Fourth, Plaintiff alleges that Defendants denied her right to leave under the Family Medical Leave Act ("FMLA") and terminated her for attempting to take such leave.

After discovery concluded, Defendants filed the instant motion for summary judgment (Doc. 19), and, in compliance with Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) (per curiam), the Clerk provided Plaintiff with notice of the motion, the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default (Doc. 20). Subsequently, Plaintiff filed a response (Doc. 21), Defendants filed a reply (Doc. 23), Plaintiff filed a sur-reply (Doc. 24), Defendants filed a second reply (Doc. 25), and Plaintiff filed a notice of intent to file a second sur-reply

(Doc. 26) before later withdrawing it (Doc. 28). Consequently, this motion is ripe for the Court's consideration.

## II. DISCUSSION

Defendants' motion for summary judgment will be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this context, facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In evaluating the contentions of the parties, the Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in [its] favor," United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc) (internal punctuation and citations omitted).

Initially, the moving party bears the burden and must show the Court, by reference to materials on file, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). How to carry this burden depends on who bears the burden of proof at trial. Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a

3

fact necessary to the non-movant's case.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex, 477 U.S. 317).  Before evaluating the non-movant's response in opposition, the Court must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  Jones v. City of Columbus, 120 F.3d 248, 254 (11th Cir. 1997) (per curiam).  A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. Clark, 929 F.2d at 608.

If — and only if — the movant carries its initial burden, the non-movant may avoid summary judgment by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment."  Id.  When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden.  If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated."  Fitzpatrick, 2 F.3d at 1116.  If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed

4

verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1117. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981). Instead, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

## A. First Amendment Right to Association

Plaintiff contends that Defendants terminated her because of her marriage to Robert Kicklighter. (Compl., Doc. 1.) As a result, Plaintiff, pursuant to 42 U.S.C. § 1983, asserts that her First Amendment rights have been violated. In their motion, Defendants contend that summary judgment is proper as to all Defendants.

### 1. Defendant Goodrich in Her Official Capacity

In defense of this claim, Defendants first argue that Eleventh Amendment immunity bars the § 1983 claim against Defendant Goodrich in her official capacity. The Eleventh Amendment to the United States Constitution provides that "the Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced, or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "Although by its terms the Amendment applies only to suits against a State by citizens of another State, our cases

have extended the Amendment's applicability to suits by citizens against their own States." Bd. of Trs. of the Univ. of Ala. v. Garrett, 531 U.S. 356, 363 (2001). Such immunity also extends to agents and instrumentalities that act as "arm[s] of the State" and "applies even when a state is not named as a party of record, if for all practical purposes the action is against the state." Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003), cert. denied, 540 U.S. 1107 (2004).

In determining whether an official is acting as an "arm of the State," the Court will weigh the four Manders factors: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity." Manders, 338 F.3d at 1309. Further, whether a defendant was acting as an "'arm of the State' must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Id. at 1308. Thus, as to this § 1983 claim, the Court must determine whether Defendant Goodrich was acting as an "arm of the State" when she terminated Plaintiff's employment. In doing so, the Court will be guided by the Eleventh Circuit's recent opinion in Pellitteri v. Prine, 776 F.3d 777 (11th Cir. 2015).

### a. How State Law Defines the Entity

The Court will begin its Manders analysis by examining how Georgia law defines clerks of court. According to the Georgia Constitution, a clerk of superior court is a "county officer." Ga. Const. art. IX, § 1. Similarly, the Georgia Constitution labels sheriffs as county officers. Id. Yet, the court in Pellitteri found that Georgia law defines the Lowndes County Sheriff as an "arm of the State" when hiring and firing deputies. See Pellitteri, 776 F.3d at 783. In reaching that conclusion, instead of relying on the Georgia Constitution's labeling, the court in Pellitteri made three inquiries. See id. at 780. First, the court examined the "'essential governmental nature'" of each sheriff's office in Georgia. Id. (quoting Manders, 338 F.3d at 1319). Second, the court examined the extent to which the Georgia Constitution provides sheriffs' offices independence from the counties that they serve. Id. Third, the court examined whether the sheriff's authority for the specific function at issue was derived from the State of Georgia. Id.

In Pellitteri, the court noted that the essential governmental nature of each sheriff's office is to "(1) 'enforce the law and preserve the peace on behalf of the sovereign State' and (2) 'to perform specific statutory duties, directly assigned by the State, in law enforcement, in state courts, and in corrections.'" Id. (quoting Manders, 338 F.3d at 1319). As

Plaintiff indicates, sheriffs and clerks of superior court do not have the same essential governmental nature. Unlike a sheriff, a clerk does not have a law enforcement, peacekeeping, or correctional role. Instead, a clerk is responsible for "receiving documents, filing, receiving fees and fines, and being present in court." (Pl.'s Sur-Reply, Doc. 24, at 4.) Yet, the Pellitteri court's chief concern was not the particular duties of the sheriff but rather for whom the sheriff was executing those duties. See Pellitteri, 776 F.3d at 780. Quoting the Eleventh Circuit's decision in Manders, the Pellitteri court concluded that Georgia sheriffs "'derive their power and duties from the State, are controlled by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs.'" Id.

With respect to clerks of superior court, they also derive their power and duties from the State, for Georgia law does not provide any county with the ability to delegate duties to the clerk of superior court. See Ga. Const. art. IX, § 1, ¶ III(a); O.C.G.A. §§ 15-6-50, 15-6-61. Though the McIntosh County Clerk of Superior Court is also the county's state and juvenile court clerk, this arrangement is not the result of a county delegation. Georgia Code § 15-6-51 provides the authority for a county's clerk of superior court to become its state court clerk, and Georgia Code § 15-11-54(a) provides for the clerk of

superior court's handling of juvenile court matters. O.C.G.A. §§ 15-6-51, 15-11-54(a).

While it is evident that superior court clerks derive their power and duties from the State, it is just as evident that superior court clerks, like the sheriffs referenced in Pellitteri, are independent of the counties they serve. For example, the Georgia Constitution prohibits counties from exercising control over or otherwise affecting clerks of superior court or their personnel. See Ga. Const. art. IX, § 2 (stating that the legislative power granted to counties "shall not be construed to extend to . . . [a]ction affecting any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority"). Additionally, the Georgia Constitution specifies that only the state legislature can establish and control the powers and duties of superior court clerks. See Ga. Const. art. IX, § 1, ¶ III. Therefore, given the Georgia Supreme Court's explanation "that sheriffs cannot be considered county employees because they are subject only to the state legislature," it follows that superior court clerks cannot be county employees for the same reason. See Pellitteri, 776 F.3d at 780 (citing Bd. of Comm'rs of Randolph Cnty. v. Wilson, 260 Ga. 482, 482 (1990)).

The final inquiry with respect to this first Manders factor is whether superior court clerks derive their authority for the

functions at issue from the State or their individual counties. Regarding Plaintiff's § 1983 claim, the function of hiring and firing deputy clerks is at issue. In Georgia, superior court clerks derive the authority for such a function from the State. O.C.G.A. § 15-6-59(b) provides that "[t]he clerks of superior courts shall have the power to appoint a deputy or deputies."

For these reasons, the first Manders factor – how state law defines the entity – weighs in favor of immunity.

### b. Degree of Control the State Maintains over the Entity

The second Manders factor for the Court to consider is the degree of control the State maintains over the entity. Prior to its decision in Pellitteri, the Eleventh Circuit had held that "sheriffs are largely independent from the State [of Georgia] when they make personnel decisions." Keene v. Prine, 477 F. App'x 575, 578 (11th Cir. 2012). However, in Pellitteri, the court stated that such a statement was incorrect for two reasons. Pellitteri, 776 F.3d at 781. First, the State of Georgia exercises a great deal of control over the hiring and firing of deputy sheriffs, and second, the sheriffs exercise their power for the State. Id.

In Pellitteri, the court noted several ways the State regulates the hiring and firing of deputy sheriffs. Id. Specifically, the court highlighted certain statutory provisions that require peace officers to be of a minimum age and to have certain intellectual, moral, and physical capabilities. Id.

The court also noted that Georgia has created a special council to address officer misconduct while also providing the governor with broad investigatory and suspension powers to discipline sheriffs if they abuse their appointment or removal powers. Id.

With respect to the hiring and firing of deputies, Georgia does not regulate superior court clerks as significantly as they do sheriffs. No statute details the physical and mental perquisites for deputy clerks, nor does any statute create a committee to discipline deputy clerks. Yet, Georgia law does require deputy clerks to take the same oath that superior court clerks take, and it also provides that deputy clerks shall have the same powers and duties as superior court clerks. See O.C.G.A. § 15-6-59. Additionally, under O.C.G.A. § 15-6-82, the Governor has broad powers to investigate and discipline superior court clerks if they abuse their appointment or removal powers. O.C.G.A. § 15-6-82.

Given the relative absence of state regulation over the personnel decisions of superior court clerks, one could conclude that the degree of control factor weighs against immunity. However, the Pellitteri court indicated that courts should not rely on the presence of regulation as the most salient consideration. See Pellitteri, 776 F.3d at 781-82. Instead, the Pellitteri court identified the "'key question'" as "'[F]or whom [do] sheriffs exercise [their] power[?]'" Id. (quoting Manders, 338 F.3d at 1319 n.35). Once applying that question to

the facts of this case, it is clear that superior court clerks exercise their hiring and firing powers for the State of Georgia. Superior court clerks select deputy clerks to assist in their duties, which they derive from the State. See Ga. Const. art. IX, § 1, ¶ III(a); O.C.G.A. § 15-6-60; Pellitteri, 776 F.3d at 782. Accordingly, the second Manders factor weighs in favor of immunity.

### c. Where the Entity Derives Its Funds

The third Manders factor involves the source of the government entity's funds. In Keene, the Eleventh Circuit had held that this factor weighed against immunity because the "[c]ounty is clearly the principal source of funding for the Sheriff's Office, including for personnel expenditures." Keene, 447 F. App'x at 579. Conversely, in Pellitteri, the court held that this factor weighed in favor of Eleventh Amendment immunity for two reasons. Pellitteri, 776 F.3d at 782. First, the State "mandates that counties set a budget for the sheriff's office," and second, counties "cannot dictate how the sheriff spends those funds." Id.

Similarly, the State mandates that counties provide substantial funding for the offices of superior court clerks. Specifically, counties must "supply all fixtures, supplies, and equipment necessary for the proper functioning" of their superior court clerk's offices, and counties must pay their clerks' salaries. See O.C.G.A. §§ 15-6-87, 15-6-88. Yet, as

12

with sheriffs, counties cannot control the actions of their superior court clerks. See Ga. Const. art. IX, § 2, ¶ I(c). Thus, the third Manders factor weighs in favor of immunity.

### d. Liability for and Payment of Adverse Judgments

Finally, the Court must consider "who is responsible for judgments against the entity." Manders, 338 F.3d at 1309. Should Plaintiff obtain an adverse judgment against the clerk of superior court, the judgment would presumably be paid out of the clerk's budget, not directly out of the budget of the State or county. See id. at 1327 (holding that a judgment against a sheriff in his official capacity would be paid out of the sheriff's budget, which is comprised of state and county funds). Therefore, as noted by both parties, this factor weighs against immunity.

Having individually evaluated and collectively balanced the four Manders factors, this Court concludes that Defendant Goodrich, in her official capacity, enjoys Eleventh Amendment immunity with respect to Plaintiff's § 1983 claim for damages. However, Plaintiff's claim for reinstatement is not similarly barred as Eleventh Amendment immunity "'does not insulate official capacity defendants from actions seeking prospective injunctive relief.'" Cross v. State of Ala., State Dep't Mental Health & Mental Retardation, 49 F.3d 1490, 1503 (11th Cir. 1995)(quoting Lassiter v. Ala. A & T Univ., 3 F.3d 1482, 1485 (11th Cir. 1993)); see also Collier v. Clayton Cnty. Serv. Bd.,

13

236 F. Supp. 2d 1345, 1364 (N.D. Ga. 2002)(holding that Eleventh Amendment immunity does not preclude a plaintiff's claim for reinstatement). Nevertheless, this claim must still survive summary judgment to move forward.

To successfully prove her retaliation claim, Plaintiff "must show that she engaged in constitutionally protected activity and that the protected conduct played a 'substantial or motivating role' in the alleged adverse employment action." Walden v. Ctrs. for Disease Control & Prevention, 669 F.3d 1277, 1289 (11th Cir. 2012)(quoting Akins v. Fulton Cnty., 420 F.3d 1293, 1303 (11th Cir. 2005)). Yet, even if Plaintiff can make both showings, Defendant Goodrich can still avoid liability if she can prove that she "would have taken the same action absent the protected conduct." Id. In evaluating this claim, the Court will view the facts in the light most favorable to Plaintiff, as described below.

During 2009, while she was employed as a deputy clerk, Plaintiff and her husband, McIntosh County Sheriff's Deputy Robert Kicklighter, began dating. (Kicklighter Dep. at 54-55.) Unsolicited and prior to the couple's marriage, Defendant Goodrich informed Plaintiff that she "needed to be careful" because Robert Kicklighter was "mentally unstable" and abusive to his wife and children. (Id. at 55-56, 66). Nevertheless, putting these comments aside, Plaintiff married Robert Kicklighter in December 2009. (Id. at 55.) However, in the

days and years that followed, Defendant Goodrich continued to make such negative comments about Plaintiff's husband. In fact, Plaintiff claims that Defendant Goodrich's negative comments and general dislike for her husband became so evident that Plaintiff's co-workers asked Plaintiff why Defendant Goodrich felt as she did. (Id. at 57, 65.)

Plaintiff also contends that Defendant Goodrich expressed her dislike for Robert Kicklighter in other, indirect ways. For example, Plaintiff claims that Defendant Goodrich would make disapproving comments and become angry about Plaintiff taking time off to care for her stepchildren. (Id. at 62-65.) Additionally, Plaintiff contends that Defendant Goodrich would tell her to get off the phone when her husband would call. (Id. at 72.) Finally, Plaintiff points to the events of March 6-7, 2014, as evidence that Defendant Goodrich terminated her because of her marriage.

On the afternoon of March 6, 2014, Robert Kicklighter entered the McIntosh County Clerk's office to file a divorce petition. (Id. at 74-78.) Unaware of his intentions, Plaintiff did not know of her husband's whereabouts until Defendant Goodrich came by her desk to obtain a case number. (Id.) Thereafter, Plaintiff watched Defendant Goodrich return to a sobbing Robert Kicklighter, but she did not hear any words exchanged between the two. (Id. at 76-78.) When Robert Kicklighter left without any apparent incident, Defendant

15

Goodrich presented Plaintiff with the petition and stated only that her husband was upset and emotional. (Id. at 78.)

The next day, March 7, 2014, Plaintiff arrived at work to find Defendant Goodrich's nephew, McIntosh County Sheriff's Deputy Ty Poppell, in the office. (Id. at 80-81.) While she could not hear their conversation, Plaintiff believed the two were discussing her husband. Plaintiff based this belief on Defendant Goodrich's earlier statement that county attorney Ad Poppell and she "could do things to [Robert Kicklighter] without [her] knowledge." (Id. at 81-83.)

While Deputy Poppell was still in the office, Plaintiff received a text message from her husband asking if Defendant Goodrich had filed a police report regarding his visit to the clerk's office on March 6. (Id. at 87.) Consequently, after Deputy Poppell left, Plaintiff approached Defendant Goodrich to determine if she had filed a report. (Id. at 80-81.) To this inquiry, Plaintiff contends that Defendant Goodrich "got very angry" and stated further: "I had to do what I had to do. He creamed me. You don't understand." (Id. at 85.) Hearing this, Plaintiff simply returned to her desk, assisted a customer, and then clocked out to head to the file room to telephone her mother. (Id. at 85-86.) However, before Plaintiff could reach the file room, Defendant Goodrich "grabb[ed] at" her and told her that she "didn't understand." (Id.) At this point, crying and physically unwell, Plaintiff left the office after clearly

expressing to Defendant Goodrich that she was not in a position to continue talking. (Id.)

Conversely, according to Defendant Goodrich, Plaintiff was much more animated on the morning of March 7 than she contends. Among other things, Defendant Goodrich noted that "[Plaintiff] was in a rage and she was hollering and screaming and moving." (Goodrich Dep. at 46.) Thus, following Plaintiff's departure on that day, Defendant Goodrich mailed her a letter, stating that (1) Plaintiff was being placed on paid leave for one week and (2) after that period, Plaintiff was to return to work and provide an explanation for her March 7th behavior or face termination.[1] (Kicklighter Dep., Ex. 2.)

Like Defendant Goodrich, Plaintiff also penned a letter dated March 7, 2014. (Kicklighter Dep., Ex. 1.) Addressed to Defendant Goodrich, Plaintiff's letter served as a medium for Plaintiff to air the many grievances she had against her boss. (Id.) Among those listed was Plaintiff's contention that Defendant Goodrich had filed a "false police report" regarding her husband's behavior in the clerk's office on March 6. (Id.) Accompanying this assertion, Plaintiff stated that Defendant Goodrich had not mentioned anything to her about any threats made by her husband. (Id.)

---

[1] Defendant Goodrich mailed this letter on March 7, 2014; however, Plaintiff did not receive it until, at the earliest, March 17, 2014. (Kicklighter Dep., Ex. 2.) At the time, Defendant Goodrich was separated from her husband and was having her mail forwarded to her mother's home. (Id. at 117-18.)

Ultimately, Plaintiff received a notice from McIntosh County Human Resource Administrator Sherry Collins dated March 20, 2014, indicating that her employment had been terminated. (Kicklighter Dep. at 110.) Prior to March 20, Plaintiff had not returned to work but had sent doctor's notes and at least one text message to Defendant Goodrich informing her of recent doctor's appointments. (Id. at 113-14.) While the notice did not provide a reason for termination, Defendant Goodrich stated in her "Employer Information on Discharge" – dated March 17, 2014 – that she terminated Plaintiff "due to insubordination." (Goodrich Dep., Ex. 1.) Defendant Goodrich went on to specify that this insubordination resulted from Plaintiff going "into a rage of anger" after learning that Defendant Goodrich "had filed a police report on [Robert Kicklighter]." (Id.)

Based on these facts, Plaintiff clearly suffered "an adverse employment action" when she was terminated from her position as chief deputy clerk.[2] See McCabe v. Sharrett, 12 F.3d 1558, 1563 (11th Cir. 1994)(stating that adverse employment action "includes not only discharges, but also demotions, refusals to hire, refusals to promote, and reprimands").

---

[2] Plaintiff also alleges that she suffered an additional adverse employment action. Specifically, Plaintiff contends that she did not receive a pay raise at some time between 2009 and 2014 when other deputy clerks did. (Kicklighter Dep. at 73.) However, Plaintiff does not have personal knowledge regarding when such raises were awarded or how much of a raise was given. (Id.) Plaintiff is only aware of such raises because she heard "the other deputy clerks making comments to each other." (Id.) In the absence of additional evidence, the Court will not consider this allegation. See Evers v. General Motors Corp., 770 F.2d 984, 986 (11th Cir. 1985)("[C]onclusory allegations without specific supporting facts have no probative value.").

Additionally, at that time, Plaintiff was engaged in the constitutionally protected activity of marriage. See id. ("[T]he right to be married . . . is a freedom of association right entitled to special constitutional protection."). As for whether Plaintiff's marriage was a "substantial or motivating factor" in her termination, this answer is less clear.

To satisfy her burden with respect to this element, Plaintiff must have presented sufficient evidence for a reasonable jury to conclude that her marriage was a substantial or motivating factor in Defendant Goodrich's decision to terminate her. See McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003). In an attempt to meet this burden, Plaintiff points to (1) the numerous ways Defendant Goodrich has expressed animus toward her marriage and (2) the police report Defendant Goodrich filed against her husband. Meanwhile, in support of summary judgment, Defendant Goodrich makes two arguments. First, Defendant Goodrich argues that the motivating factors in her termination decision were Plaintiff's insubordinate behavior on March 7 and her failure to return to work. Second, Defendant Goodrich argues that Plaintiff's marriage in December 2009 and Plaintiff's termination in March 2014 are two events "so temporally remote that no reasonable jury could conclude that the marriage was a substantial or motivating factor in the employment decision." (Defs'. Br., Doc. 19-1, at 18.)

Despite Defendant Goodrich's argument, because Plaintiff was still married at the time of her termination, no temporal gap existed between the two events. In fact, when viewing the facts in the light most favorable to Plaintiff, the events of March 6-7, 2014 – particularly the police report filed by Defendant Goodrich – are enough to dispel the idea that Plaintiff's marriage was irrelevant to Defendant Goodrich. While it would certainly seem less likely that Defendant Goodrich would terminate Plaintiff for her marriage at a time when the marriage was apparently ending, this is an issue of fact for a jury, not a question of law for the Court. At this juncture, Plaintiff has presented enough evidence to raise a genuine dispute as to whether her marriage was a motivating factor in Defendant Goodrich's termination decision.

Even with this genuine dispute of material fact, Defendant Goodrich can still prevail on summary judgment. To do so, however, Defendant Goodrich must provide more than just an objectively legal basis for Plaintiff's termination. Defendant Goodrich must show that she "would have taken the same action absent the protected conduct." See Walden, 669 F.3d at 1289; see also Holley v. Seminole Cnty. School Dist., 755 F.2d 1492, 1505 (11th Cir. 1985)("[T]he issue is not whether the Board had objective reason not to renew [the plaintiff] – it apparently did – but rather, what in fact motivated the Board."). Since this inquiry involves an examination of a government official's

intentions, some courts have summarily held that this issue "is a factual dispute that must be resolved at trial and is inappropriate for resolution on summary judgment." See, e.g., Lewis v. Eufaula Cnty. Bd. of Educ., 922 F. Supp. 2d 1291, 1305-06 (M.D. Ala. 2012).

In this case, Defendant Goodrich has provided differing reasons for Plaintiff's dismissal. Within her briefs, Defendant Goodrich contends that Plaintiff was dismissed because Plaintiff "left her job and then refused to return for nearly two weeks." (Defs'. Br., Doc. 19-1, at 19.) Supporting this contention, the record indisputably indicates that (1) Defendant Goodrich sent a letter to Plaintiff informing her that she must return to work within a week's time and (2) Plaintiff failed to return to work within that time frame. (Kicklighter Dep. at 114 & Ex. 2.) Conversely, in her "Employer Information on Discharge," Defendant Goodrich stated that she terminated Plaintiff because of the "insubordination" and "rage of anger" she exhibited on March 7, 2014. (Goodrich Dep., Ex. 1.) As to this insubordination claim, Plaintiff has, as previously highlighted, presented testimony in opposition. (Kicklighter Dep. at 85, 91-92.) Therefore, when considering Defendant Goodrich's differing termination rationale — the underlying facts of which are in dispute — this Court cannot say as a matter of law that Defendant Goodrich would have terminated Plaintiff irrespective of her marriage. See Stewart v. Baldwin Cnty. Bd. of Educ., 908

F.2d 1499, 1506-07 (11th Cir. 1990)(holding that a question of fact existed when evidence indicated that the facts given for employee's termination were in dispute); Fikes v. City of Daphne, 79 F.3d 1079, 1084-85 (11th Cir. 1996)(noting the significance of an employer's differing termination rationale). Consequently, Plaintiff's § 1983 claim for reinstatement against Defendant Goodrich, in her official capacity, survives summary judgment.

## 2. Defendant Goodrich in Her Individual Capacity

Defendant Goodrich, in her individual capacity, contends that qualified immunity protects her from any liability under Plaintiff's § 1983 claim. However, "[i]n order to receive qualified immunity, the public official must prove that [s]he was acting within the scope of h[er] discretionary authority when the allegedly wrongful acts occurred." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002)(internal quotations marks omitted). If the official can make this showing, the burden shifts to the plaintiff. Id. At such point, the Court must first determine – evaluating the facts in the light most favorable to the plaintiff – whether the facts indicate that the official's conduct violated a constitutional right. Id. Then, "'in light of the specific context of the case,'" the Court must evaluate "'whether the right was clearly established.'" Id. (quoting Saucier v. Katz, 533 U.S. 194, 201 (2002)).

In this case, it is undisputed that Defendant Goodrich was acting within the scope of her discretionary authority when she terminated Plaintiff's employment. See O.C.G.A. § 15-6-59(b) ("The clerks of superior courts shall have the power to appoint a deputy or deputies."). Further, as noted in the previous section, a genuine issue of material fact exists as to the constitutional violation that Plaintiff alleges. Thus, this Court must now decide whether Defendant Goodrich violated clearly established law.

"'Where the facts assumed for summary judgment purposes in a case involving qualified immunity show mixed motives (lawful and unlawful motivations) and pre-existing law does not dictate that the merits of the case must be decided in Plaintiff's favor, the defendant is entitled to immunity.'" Stanley v. City of Dalton, Ga., 219 F.3d 1280, 1295 (11th Cir. 2000)(quoting Foy v. Holston, 94 F.3d 1528, 1535 (11th Cir. 1996)). A public official has "lawful and unlawful motivations" if the record indisputably establishes (1) that objectively valid reasons exist for the defendant's conduct and (2) that the defendant was motivated, at least in part, by such lawful considerations. Id. Here, it is undisputed that Defendant Goodrich, in terminating Plaintiff, was motivated at least in part by Plaintiff's failure to return to work as required by Defendant Goodrich's letter. In reaching this conclusion, the Court relies significantly upon two facts. First, Plaintiff was not terminated until after

23

Defendant Goodrich's letter was sent and after Plaintiff failed to return to work within the designated time frame. (Kicklighter Dep. at 110-15 & Ex. 2.) Second, though Plaintiff's termination came while she was married, it came more than five years after the marriage was solemnized. (Kicklighter Dep. at 55.)

Having found Plaintiff's termination to be motivated, at least in part, by objectively valid considerations, this Court must now determine whether a reasonable superior court clerk would have known that firing Plaintiff for both her marriage and her failure to return to work violated Plaintiff's constitutional rights. Here, Plaintiff has not pointed to – nor is the Court aware of – any cases that have clearly established that Defendant Goodrich could not have acted lawfully under these circumstances. As a result, the Court cannot find a violation of clearly established law, and Defendant Goodrich, in her individual capacity, is entitled to qualified immunity on Plaintiff's § 1983 claim.

### 3. Defendant McIntosh County Board of Commissioners

Plaintiff also contends that Defendant McIntosh County Board is liable for Defendant Goodrich's unconstitutional actions. However, a county is liable under § 1983 only when a county policy causes a constitutional violation and the county has control over the policy. See Grech v. Clayton Cnty., Ga., 335 F.3d 1326, 1329, 1331 (11th Cir. 2003). In this case, as

24

previously indicated, McIntosh County had no control over who Defendant Goodrich hired and fired. Thus, Defendant McIntosh County Board cannot be liable under Plaintiff's § 1983 claim.

## B. Fair Labor Standards Act

Plaintiff next alleges that Defendants are liable to her under the FLSA for uncompensated hours of overtime.

### 1. Defendant Goodrich in Her Official Capacity

As she did in the context of Plaintiff's § 1983 claims, Defendant Goodrich, in her official capacity, contends that Eleventh Amendment immunity bars Plaintiff's FLSA claim for damages. In the paragraphs above, this Court determined that Plaintiff's § 1983 claim for damages against Defendant Goodrich was barred by Eleventh Amendment immunity. Because of this finding, Defendant Goodrich contends that she is protected by the Eleventh Amendment against all of Plaintiff's claims. However, this contention is not necessarily true. The Manders analysis depends, at least in part, on the specific function at issue.

For Plaintiff's § 1983 claim, the function at issue was the hiring and firing of employees. Here, the function at issue is the compensation of employees. Despite being distinguishable, these functions have been treated as one for purposes of the Manders inquiry. See Walker v. Jefferson Cnty. Bd. of Educ., 771 F.3d 748, 757 (11th Cir. 2014)(noting that the issues of

employee hiring, assignment, and compensation fall under the function of "employee-related decisions"). Therefore, Defendant Goodrich, in her official capacity, is also protected against Plaintiff's FLSA claim for damages.

Besides damages, Plaintiff also asks the Court to require "Defendant [to] immediately cease its practice of failing to pay its employees minimum wage in violation of the requirements of the FLSA." (Compl., Doc. 1.) Yet, "the right to bring an action for injunctive relief under the Fair Labor Standards Act rests exclusively with the United States Secretary of Labor." Powell v. Florida, 132 F.3d 677, 678 (11th Cir. 1998). As a result, Plaintiff's FLSA claim for injunctive relief against Defendant Goodrich, in her official capacity, must fail.

### 2. Defendant Goodrich in Her Individual Capacity

Plaintiff specifically contends that Defendant Goodrich, in her individual capacity, faces FLSA liability because she was Plaintiff's "employer" at all relevant times. See 29 U.S.C. § 207 (providing that no employer shall employ any of her employees for more than forty hours in a workweek unless that employee receives overtime compensation). Here, however, Plaintiff's claim must fail because "a public official sued in [her] individual capacity is not an 'employer' under the FLSA." Wascura v. Carver, 169 F.3d 683, 686 (11th Cir. 1999)(citing Welch v. Laney, 57 F.3d 1004, 1011 (11th Cir. 1995)).

26

### 3. Defendant McIntosh County Board of Commissioners

Plaintiff further contends that Defendant McIntosh County Board is liable for the overtime payments Plaintiff seeks. While McIntosh County may provide Defendant Goodrich with the funding she needs to pay her employees, Defendant McIntosh County Board is not Plaintiff's employer. See Ga. Const. art. IX, § 2, ¶ I(c)(1)(stating that counties do not have the power to "affect[] any elective county office, the salaries thereof, or the personnel thereof, except the personnel subject to the jurisdiction of the county governing authority); Taylor v. Bartow Cnty., Ga., 860 F. Supp. 1526, 1536 (N.D. Ga. 1994)("Deputy clerks of superior court are not county employees, but the employees of the clerk of superior court."); Warren v. Walton, 202 S.E.2d 405, 409 (Ga. 1973)(stating that "deputy sheriffs are personnel of the sheriff," not personnel subject to jurisdiction of the county). Therefore, Plaintiff's FLSA claim against Defendant McIntosh County Board cannot continue.

### C. Americans with Disabilities Act

Plaintiff next alleges that Defendants are liable for terminating her on the basis of a disability in violation of the ADA.

### 1. Defendant Goodrich in Her Official Capacity

In defense of Plaintiff's ADA claims, Defendant Goodrich, in her official capacity, contends that Eleventh Amendment

immunity protects her from liability. As the alleged wrongful conduct stems from Plaintiff's termination, the conduct at issue is the hiring and firing of employees. Because this Court has already determined that clerks of superior court are "arm[s] of the State" for purposes of this function, Defendant Goodrich, in her official capacity, cannot be liable for damages under this claim.

In addition to her claim for damages, however, Plaintiff also seeks a declaratory judgment and multiple forms of injunctive relief. (Compl., Doc. 1.) Addressing the former request first, Plaintiff seeks a declaratory judgment stating that "Defendants' acts, policies, practices, and procedures complained of herein violated Plaintiff's rights as secured under the ADAAA." (Compl., Doc. 1.) Yet, the Eleventh Amendment "bars suits against state officials in federal court seeking retrospective or compensatory relief." Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326, 1337 (11th Cir. 1999). Accordingly, because the declaratory judgment that Plaintiff seeks would only address the legality of the prior actions of a state official, this form of relief is unavailable.

As for Plaintiff's claims for injunctive relief, Plaintiff requests that the Court (1) issue a permanent injunction that enjoins "Defendants, its chief, agents, employees, attorneys, and all of those acting in concert with them from engaging in any employment practice or policy which discriminates against

the Plaintiff and others similarly situated because of the exercise of their rights under the ADA, or because of their participation in this lawsuit" and (2) reinstate her to her former position. (Id.) Regarding the permanent injunction, "[i]t is well settled that a 'plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" AT&T Mobility, L.L.C. v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 494 F.3d 1356, 1361-62 (11th Cir. 2007). Therefore, to the extent Plaintiff seeks a permanent injunction on behalf of "others similarly situated," this claim fails. See Jones v. Buckner, 963 F. Supp. 2d 1267, 1284 (N.D. Ala. 2013)(holding that Plaintiff has no standing to enjoin Defendants from prospectively harming nonparties in a similar fashion). Furthermore, Plaintiff has standing for injunctive relief as to herself "'only if [she] alleges, and ultimately proves, a real and immediate - as opposed to a merely conjectural or hypothetical - threat of future injury.'" Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001)(quoting Church v. City of Huntsville, 30 F.3d 1332, 1337 (11th Cir. 1994)). In preparing to make such a showing, Plaintiff must note that "'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects.'" Wooden, 247 F.3d at 1284 (quoting

29

O'Shea v. Littleton, 414 U.S. 488, 496 (1974)). While Plaintiff has alleged prior ADA-based injuries, she has not made any allegations or presented evidence indicating that she faces a threat of future injury. Consequently, Plaintiff's claim for a permanent injunction cannot continue.

Conversely, Plaintiff's claim for reinstatement is properly alleged and is not subject to Eleventh Amendment immunity. See 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(g)("[T]he court may enjoin the respondent from engaging in such unlawful employment practice and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement."); Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1338 (11th Cir. 1999)(stating that reinstatement is a proper remedy for ADA discrimination as it is "the most likely means of making a plaintiff whole"); see also Cross, 49 F.3d at 1503 (11th Cir. 1995)(stating that the Eleventh Amendment "'does not insulate official capacity defendants from actions seeking prospective injunctive relief'"). However, Defendant Goodrich, in her official capacity, cannot be liable under the ADA, for she is not an ADA "employer" – "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year." 42 U.S.C. § 12111(5)(A). While Defendant McIntosh County Board may have had more than fifteen employees for each working day, Defendant Goodrich never had

30

more than eight full-time employees and two summer interns. (Kicklighter Dep. at 20-25.) Accordingly, Plaintiff's ADA claim for reinstatement must fail.

### 2. Defendant Goodrich in Her Individual Capacity

In her individual capacity, Defendant Goodrich contends that she is not liable under Plaintiff's ADA claims. According to the Eleventh Circuit, "individual defendants are not amenable to private suit for violating the anti-discrimination provision of Subchapter I of the ADA." Albra v. Advan, Inc., 490 F.3d 826, 830 (11th Cir. 2007). Consequently, Defendant Goodrich cannot be liable in her individual capacity for Plaintiff's ADA claims, which are all brought under Subchapter I.

### 3. Defendant McIntosh County Board of Commissioners

Defendant McIntosh County Board asserts that it can have no ADA liability to Plaintiff because Defendant Goodrich, not McIntosh County, was Plaintiff's employer. Although the Eleventh Circuit has not ruled specifically on this issue, the Northern District of Georgia has stated that "[d]eputy clerks of superior court are not county employees, but the employees of the clerk of superior court." Taylor, 860 F. Supp. at 1536. Given this decision and our earlier "arm of the State" analysis, this Court agrees that Plaintiff's employer was Defendant Goodrich, not Defendant McIntosh County Board. Therefore, Plaintiff's ADA claim against Defendant McIntosh County Board cannot continue.

## D. Family Medical Leave Act

Finally, Plaintiff asserts a FMLA claim against Defendants alleging that they denied her FMLA rights and terminated her for attempting to exercise those rights.

### 1. Defendant Goodrich in Her Official Capacity

Defendant Goodrich, in her official capacity, contends that she is immune from Plaintiff's FMLA claims by virtue of the Eleventh Amendment. As a general matter, Eleventh Amendment immunity protects state officials from claims for damages, but, in the FMLA context, such immunity is only definite as to suits filed pursuant to the FMLA's self-care provisions. See Coleman v. Ct. of App. of Md., 132 S. Ct. 1327, 1334, 1338 (2012). Suits for damages under certain family-care provisions are not barred by the Eleventh Amendment. Id. However, in this case, Plaintiff has only provided evidence to support violations of the self-care provisions.[3] Therefore, Defendant Goodrich will be protected by the Eleventh Amendment so long as she was acting as an "arm of the State" for the functions at issue.

Regarding Plaintiff's FMLA claim of wrongful termination, Defendant Goodrich is immune, for the Court has already found that superior court clerks are "arm[s] of the State" when hiring and firing employees. Similarly, regarding Plaintiff's claim

---

[3] In support of her contention that Defendant Goodrich violated the family-care provisions, Plaintiff points to the fact that Defendant Goodrich once questioned her ability to use "sick time" to care for her ill stepchildren. (Kicklighter Dep. at 63.) However, because Plaintiff was attempting to use sick time and not FMLA leave, this evidence is insufficient to prove an FMLA claim.

that Defendant Goodrich denied her request for FMLA-qualifying leave, superior court clerks are also immune. When entertaining such a request or demand for leave, superior court clerks are making employee-related decisions. In that capacity, as noted with respect to Plaintiff's FLSA claim, superior court clerks are also "arm[s] of the State." As a result, Plaintiff's FMLA claims for damages against Defendant Goodrich, in her official capacity, cannot continue as a matter of law.

As for Plaintiff's FMLA claim for reinstatement, Defendant Goodrich contends FMLA liability cannot attach for two separate reasons. First, Defendant Goodrich did not have enough employees to be an FMLA "employer," and, second, Plaintiff was a member of Defendant Goodrich's personal staff. With respect to the first argument, Defendant Goodrich is incorrect, for in her official capacity as a superior court clerk, Defendant Goodrich is an FMLA employer. Although FMLA employers include private sector employers with 50 or more employees, they also include "'public agenc[ies]', as defined in section 203(x) of [the FLSA]." See 29 U.S.C. § 2611(4). Thus, because a public agency includes "the government of a State or a political subdivision thereof" as well as "any agency of . . . a State[] or a political subdivision of a State," Plaintiff was employed by an FMLA employer. See 29 U.S.C. § 203(x); 29 C.F.R. § 825.108(d)("All public agencies are covered by the FMLA regardless of the number of employees.").

Despite these provisions, Defendant Goodrich's argument was not totally misplaced. Under the FMLA, "[e]mployees of public agencies must meet all requirements of eligibility, including the requirement that the employer . . . employ 50 employees at the worksite or within 75 miles." 29 C.F.R. § 825.108. Hence, if the public agency does not have fifty or more employees within 75 miles, its employees are not entitled to the protections of the FMLA. Though seemingly an easy application, this Court must first determine whether (1) the State of Georgia, (2) McIntosh County, or (3) the McIntosh County Clerk of Superior Court was the public agency for which Plaintiff was employed.

According to 29 C.F.R. § 825.108, whether two or more agencies actually constitute the same public agency "can only be determined on a case-by-case basis." In making this determination, "[o]ne factor that would support a conclusion that two agencies are separate is whether they are treated separately for statistical purposes in the Census of Governments." 29 C.F.R. § 825.108. Nonetheless, this factor is not necessarily dispositive. For example, when it was faced with the question of whether a local housing authority and the State of Louisiana were separate public agencies, the Western District of Louisiana did not even consider census data. See Carmouche v. Marksville Hous. Auth., No. 12-3023, 2013 WL 3049408, at *2-3 (W.D. La. June 17, 2013); see also Rollins v.

Wilson Cnty. Gov't, 154 F.3d 626, 629 (6th Cir. 1998)("A court should decide the status of the governmental entities based on state law if state law definitively resolves the issue."). Instead, the Carmouche court looked to Louisiana law and held that the government entities were separate because the housing authority was responsible for its debts, could own property, and may sue and be sued directly. Carmouche, 2013 WL 3049408, at *3.

Within the Georgia section of the 2012 Census of Governments, there is no mention of clerks of court, state court judges, or any other judicial organizations. In light of this, one could, based on 29 C.F.R. § 825.108, conclude that the McIntosh County Clerk of Superior Court is not itself an independent public agency. However, it would be imprudent for this Court to do so without first examining Georgia law.

Under Georgia law, McIntosh County is not the agency for which Plaintiff is employed. See Taylor, 860 F. Supp. at 1536 ("Deputy clerks of superior court are not county employees, but the employees of the clerk of superior court."); Griffies v. Coweta Cnty., 530 S.E.2d 718, 719 (Ga. 2000)("Griffies, as clerk of superior court, is an elected constitutional officer and is not an employee of the county commission."). Moreover, in view of the Court's earlier "arm of the State" determination, it seems inconsistent for one to conclude that clerks of superior court could be public agencies separate from the State. Yet,

because of the accompanying four factors, Georgia law indicates that the McIntosh County Clerk of Superior Court is in fact a separate agency. First, the State is not responsible for the clerks' day-to-day financing needs. See, e.g., O.C.G.A. §§ 15-6-88. Second, the State does not provide the clerks of superior court with the supplies and equipment it needs to function properly. See O.C.G.A. § 15-6-87. Third, clerks of superior court can sue and be sued directly. See Taylor, 860 F. Supp. at 1536 (example of superior court clerk being sued); Griffies, 530 S.E.2d at 718 (example of superior court clerk suing). Fourth, superior court clerks have discretion over who should be hired and fired as deputies, when deputies will be promoted, and how deputies should be trained. See O.C.G.A. § 15-6-59.

As for the final stage in the "eligible employee" analysis, the Court must determine whether the public agency "employ[s] 50 employees at the worksite or within 75 miles." 29 C.F.R. § 825.108. Given Plaintiff's testimony that Defendant Goodrich never employed more than eight deputy clerks and two summer interns, the McIntosh Clerk of Superior Court does not meet this requirement. (Kicklighter Dep. at 20-25.) As a result, Plaintiff is not an "eligible employee" under the FMLA, and her FMLA claims cannot proceed. Though this outcome may seem inconsistent with the purpose of the FMLA, the Sixth Circuit has stated that "[t]here is nothing illogical in concluding . . . that Congress intended to restrict FMLA benefits to public

36

employees who work for public employers with a not-insubstantial workforce." Tilley v. Kalamazoo Cnty. Rd. Comm'n, 777 F.3d 303, 311 (6th Cir. 2015).

### 2. Defendant Goodrich in Her Individual Capacity

In defense of the FMLA claims, Defendant Goodrich, in her individual capacity, contends that she is not an FMLA employer. Consistent with this contention, the Eleventh Circuit has held that "a public official sued in his or her individual capacity is not an 'employer' under the FMLA." Wascura, 169 F.3d at 687. As a result, Plaintiff's FMLA claims against Defendant Goodrich, in her individual capacity, must fail.

### 3. Defendant McIntosh County Board of Commissioners

Finally, Defendant McIntosh County Board contends that it cannot be liable under the FMLA as it is not Plaintiff's employer. As already concluded with respect to Plaintiff's § 1983, FLSA, and ADA claims, Defendant McIntosh County Board is not Plaintiff's "employer." See Taylor, 860 F. Supp. at 1536 (N.D. Ga. 1994)("Deputy clerks of superior court are not county employees, but the employees of the clerk of superior court."). Thus, this claim cannot survive Defendants' motion.

## III. CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment (Doc. 19). Of her claims, only Plaintiff's § 1983 claim for reinstatement against Defendant Goodrich, in her official capacity, shall proceed to trial. Thus, the Clerk is directed to **ENTER JUDGMENT** in favor of Defendant Goodrich, in her individual capacity, and in favor of Defendant McIntosh County Board of Commissioners. The Clerk is further directed to **TERMINATE** Defendant Goodrich, in her individual capacity, and Defendant McIntosh County Board of Commissioners as parties.

**ORDER ENTERED** at Augusta, Georgia, this _19th_ day of February, 2016.

HONORABLE J. RANDAL HALL
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA